DEAN A. BENHAM AND ESTATE OF RUTH R. BENHAM, DECEASED, DEAN A. BENHAM, EXECUTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Benham v. Commissioner
Docket No. 436-88.
United States Tax Court
T.C. Memo 1989-215; 1989 Tax Ct. Memo LEXIS 215; 57 T.C.M. (CCH) 323; T.C.M. (RIA) 89215; May 4, 1989. Wayne Toliver, for the petitioners. Donna L. Bice, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies and additions to tax in petitioners' Federal income tax liability for the calendar year 1983 as follows: Additions to Tax, Sections
Tax Year Ended
Deficiency
6653(a)(1),
6653(a)(2)
December 31, 1983
$ 17,220.90
$ 861.05
50% of interest
due on $ 17,220.90
The issue for decision is whether petitioner, Dean A. Benham (Mr. Benham or petitioner), is a "qualified individual" under section 911(d)(1) entitled to exclude a portion of his 1983 overseas wages from gross income as "foreign earned income" under section 911(a). [1]
*217 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of the petition in this case, Mr. Benham resided in Wylie, Texas. Mr. Benham is the Executor of the Estate of Ruth R. Benham, Deceased, which is also a petitioner in this action. Ruth R. Benham was the wife of petitioner prior to her death on August 10, 1983. Petitioner also had two children, one of whom was under the age of eighteen during the year here at issue. During 1983, and for several years prior thereto, Mr. Benham was employed by the Mobil Pipeline Company (Mobil). In July 1978, Mr. Benham was transferred by Mobil to Saudi Arabia in connection with a pipeline construction project which was scheduled for completion in approximately two years. Petitioner acquired and maintained a Saudi Arabian work visa throughout his stay in Saudi Arabia. His initial job with the project was as a field engineer surveying the route of the pipeline. When construction started, he became a construction engineer and, by the time the project was completed, he was employed as an assistant construction manager. The actual construction time of the pipeline was approximately two *218 and one half years. After construction was completed towards the end of 1980, petitioner stayed on in Saudi Arabia because he enjoyed his work there and because he received a larger salary in Saudi Arabia than he would have received in the United States. He became an engineer in one of the operating areas and eventually took a job as operations manager. While assigned to the pipeline in Saudi Arabia, petitioner would work for a six-week period which would be followed by a three-week rest period. This work pattern continued for petitioner until the death of Mrs. Benham on August 10, 1983, at which time petitioner left Saudi Arabia and came back to the United States with no immediate plans to return to Saudi Arabia. He did not, thereafter, return to work in Saudi Arabia. The following is a list of dates of petitioner's arrivals in and departures from the United States together with the number of days he spent in the United States: Arrived in U.S.
Departed from U.S.
No. of Days in U.S.
12/23/82
1/11/83
11
2/25/83
3/15/83
19
4/29/83
5/17/83
19
7/08/83
8/01/83
25
8/11/83
--   143
Total
217
During the construction of the pipeline, *219 petitioner lived in a camp with about 600 other men. After construction was complete, petitioner moved into a permanent installation located in the area of operations to which he was assigned. The closest city to the installation, Riyad, was approximately two hours away by car. Another city, Abqaiq, was located to the east, and was a three to four-hour drive by car. However, there were small villages and Bedouin camps which were located closer to the permanent installation. Approximately 126 workers were assigned to the permanent installation. Out of these, 15 to 20 were Americans. The remaining workers were "third country nationals" including Saudis, Pakistanis, Indians, Filipinos, and British. Despite their varying nationalities, Mobil required all of these workers to know the English language and, thus, English was the primary language utilized within the installation. Petitioner did acquire a limited knowledge of the Arabic language and could carry on short conversations in that language. Mobil provided all of petitioner's food and lodging when he was in Saudi Arabia. Petitioner's living quarters was an eight by twelve foot room located in one of the buildings within *220 the installation. During his six-week work period, petitioner worked twelve hours a day, seven days a week. This left very little time for socializing. However, petitioner did mingle with his fellow workers, including the third country nationals. They shared the same mess hall and recreation room. For the most part, petitioner remained within the Mobil installation. However, petitioner would travel to the city of Riyad in order to cash his and the other workers' paychecks in accordance with an arrangement with one of the local banks in Riyad. Petitioner was furnished a vehicle by Mobil and possessed a Saudi driver's license. Because petitioner had very little free time, both the vehicle and the driver's license were used primarily for work-related purposes. Petitioner paid Saudi Arabian "social insurance" tax but did not pay any Saudi Arabian income tax. During 1983, petitioner's wife and minor child lived in the family home in Texas. Petitioner could have brought his wife and child with him to Saudi Arabia. However, he declined to do so because of instability in the Middle East and because he felt that Saudi society would be too constricting for his wife. In addition, *221 during this period, petitioner's marriage was "kind of shaky." Also, due to a lack of suitable schools in Saudi Arabia, it would have been necessary for his child to attend school in Europe. At the end of each 42-day work period in Saudi Arabia, petitioner returned to his family home in the United States. Mobil paid for petitioner's travel between Saudi Arabia and the United States. Petitioner was registered to vote in Texas although he was usually gone during elections and did not vote absentee. He also maintained bank accounts in Texas. Petitioner owned two vehicles which were registered in Texas and had a Texas driver's license. Mr. and Mrs. Benham owned, as community property, several rental properties in Texas. Mrs. Benham was in charge of keeping the properties occupied while Mr. Benham was away. Mr. Benham sold the properties after Mrs. Benham's death in 1983. Mr. and Mrs. Benham also owned a farm on which they raised horses in 1983. On their Federal income tax return for their 1983 calendar year, petitioners claimed a foreign earned income exclusion in the amount of $ 31,344. In addition, petitioners reported interest income in the amount of $ 36.42 from the Republic *222 Bank of Garland. Finally, petitioners claimed entitlement to a foreign tax credit in the amount of $ 3,492.82. In his notice of deficiency for petitioners' 1983 calendar year, respondent determined that petitioners were not entitled to any foreign earned income exclusion, that petitioners had $ 455 in unreported interest income from the Republic Bank of Garland, and that petitioners were not entitled to any foreign tax credit. Respondent also determined that petitioners were liable for additions to tax under section 6653(a)(1) and section 6653(a)(2). OPINION Section 911(a) provides, in part, that, "At the election of a qualified individual * * * there shall be excluded from the gross income of such individual, and exempt from taxation under this subtitle, for any taxable year * * * the foreign earned income of such individual * * *." The issue here is whether petitioner was a "qualified individual" in 1983 and thus entitled to exclude a portion of his wages from gross income as "foreign earned income." *223 Section 911(b)(1) defines the term "foreign earned income" as the amount received by an individual from sources within a foreign country or countries which constitutes earned income "attributable to services performed by such individual during the period described in subparagraph (A) or (B) of subsection (d)(1), whichever is applicable." Section 911(d)(1) provides that, for purposes of section 911: (1) QUALIFIED INDIVIDUAL. -- The term "qualified individual" means an individual whose tax home is in a foreign country and who is -- (A) a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or (B) a citizen or resident of the United States and who, during any period of 12 consecutive months, is present in a foreign country or countries during at least 330 full days in such period. It is clear, in the instant case, that petitioner was not physically present within Saudi Arabia for 330 full days in a tax year which began or ended in 1983 and petitioners do not contend otherwise. Therefore, in order to be entitled *224 to exclude a portion of his wages from Federal income tax under section 911(a), petitioner must show, first, that his "tax home" was in a foreign country (Saudi Arabia) and, second, that he was a bona fide resident of such foreign country. Because we conclude that petitioner's "tax home" was not in a foreign country during the year at issue, petitioner cannot take advantage of the provisions of section 911(a) and, therefore, we need not reach the question of bona fide residency. Section 911(d)(3) defines the term "tax home" as an individual's home for purposes of section 162(a)(2) (relating to traveling expenses while away from home), but specifically provides that "An individual shall not be treated as having a tax home in a foreign country for any period for which his abode is within the United States." See also section 1.911-2(b), Income Tax Regs.
In Bujol v. Commissioner,T.C. Memo. 1987-230, affd. without published opinion 842 F.2d 328 (5th Cir. 1988), we made the following statements concerning the term "abode": "Abode" has *225 been variously defined as one's home, habitation, residence, domicile, or place of dwelling. Black's Law Dictionary 7 (5th ed. 1979). While an exact definition of "abode" depends upon the context in which the word is used, it clearly does not mean one's principal place of business. Thus, "abode" has a domestic rather than vocational meaning, and stands in contrast to "tax home" as defined for purposes of section 162(a)(2) [Fn. ref. omitted.] Bujol v. Commissioner,53 T.C.M. 762, at 763-764, 56 P-H Memo T.C. par. 87,230 at 1112-87. In Lemay v. Commissioner,837 F.2d 681 (5th Cir. 1988), affg. a Memorandum Opinion of this Court, the Fifth Circuit quoted with approval this language from the Bujol case which we have set forth above. The taxpayer in Lemay v. Commissioner, supra, worked a 28/28 schedule (a 28-day work period followed by a 28-day rest period) on an oil rig in the territorial waters of Tunisia. The taxpayer spent all of his work periods on the rig (except for occasional trips to his employer's headquarters on the Tunisian mainland) and his employer paid all of his food and lodging expenses while he was on *226 the rig. His employer also paid the Tunisian government all taxes relating to his earnings from his employment in Tunisia. The taxpayer returned to the United States at the beginning of each rest period to be with his wife and daughter who remained behind at the family residence in Lake Charles, Louisiana. His employer provided round-trip air fare between Tunisia and the United States. The taxpayer was registered to vote in Louisiana, maintained bank accounts in Louisiana, and possessed a Louisiana state driver's license. Based on the foregoing facts, this Court concluded that the taxpayer had maintained strong economic, familial, and personal ties to his residence in the United States. Therefore, his "abode" remained in the United States and he was not a "qualified individual" within the meaning of section 911(d)(1). On appeal, the Fifth Circuit upheld our conclusion that the taxpayer's "abode" remained within the United States. The Fifth Circuit agreed with us that the taxpayer had retained significant economic, familial, and personal ties to his residence in Lake Charles, Louisiana while, in contrast, his ties to Tunisia were merely transitory. Since the taxpayer's "abode" *227 remained within the United States during the year at issue, his "tax home" for purposes of section 911 was not in a foreign country. Lemay v. Commissioner, supra at 684. In the instant case, we also conclude that petitioner maintained an abode within the United States during 1983 and, therefore, his "tax home" was not in Saudi Arabia. While maintenance of a dwelling within the United States does not necessarily mean that a taxpayer's abode is within the United States ( section 1.911-2(b), Income Tax Regs.), it is clear that petitioner did much more than merely maintain a dwelling in Texas. Mr. Benham retained significant familial, economic, and personal ties to his residence in the United States. For example, his wife and children remained at this residence, thus assuring his eventual return to the United States. He did, indeed, return during each rest period and, in fact, spent more than half of 1983 in the United States. He maintained bank accounts in Texas. He owned real property in Texas from which he derived income. Mr. Benham was also registered to vote in Texas. The vehicles which he owned were registered in Texas. In *228 contrast, Mr. Benham's ties to Saudi Arabia were merely transitory. This is so even though he worked in Saudi Arabia for several years. Mr. Benham was assigned to an isolated installation maintained by his employer. His meals and recreation were provided within the installation. Thus, Mr. Benham had little, if any, contact with everyday Saudi life. Although Mr. Benham may have made friends with some Saudis, he did so in the course of his work. He did not attempt to make personal contacts outside the workplace. Petitioner did not maintain bank accounts in Saudi Arabia nor did he pay income tax to the Saudi Arabian government. He only paid social insurance tax which, at some point in the future, will be paid back to him. In short, we conclude that Mr. Benham merely worked within Saudi Arabia and his "abode" was within the United States during 1983. Therefore, his "tax home" was not in a foreign country for purposes of section 911, he was not a "qualified individual" within the meaning of section 911(d)(1), and he is not entitled to exclude any portion of his wages under section 911(a). In their petition, the only assignment of error raised by petitioners with respect to respondent's *229 notice of deficiency was the disallowance of the foreign earned income exclusion. At trial and on brief, the only issue addressed by petitioners was the availability of the foreign earned income exclusion under section 911. Thus, petitioners are deemed to have conceded the adjustments relating to additional interest income, disallowance of the foreign tax credit, and the additions to tax under section 6653(a)(1) and section 6653(a)(2). Rule 34(b)(4). Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩